WICKER, Judge.
This appeal arises from a suit on an open account and personal guaranty filed on behalf of plaintiff/appellee Acme Boot Company, Inc. against defendants/appellants Sydney Goldstein and Celeste Goldstein. Dance Ranch Enterprises, Inc. was also sued but it subsequently filed for bankruptcy. The Goldsteins appeal a judgment enforcing a personal guaranty against them for a debt incurred by Dance Ranch, Inc. in the amount of $94,967.48, interest, and costs. We affirm.
The parties stipulated at trial the principal balance “owed in this matter” was $94,-967.48 and that “[ijtems totalling those amounts were delivered.” The Goldsteins urged failure of consideration as a defense. They contend the sole purpose for the personal guaranty was to obtain 444 pairs of boots for a Mardi Gras promotion. They allege these boots were never shipped. They specify the following errors on appeal:
1. The trial court erred in finding that the personal guaranty executed by defendants Sydney and Celeste Goldstein was not subject to a suspensive condition, and
2. The trial court erred in finding that the consideration for executing the personal guaranty had failed by (1) the failure of the plaintiff to perform under the principal contract as originally envisioned; (2) by the change in terms imposed by the plaintiff.
The testimony at trial set forth the following.
Sydney Goldstein testified he was an officer of Dance Ranch. He admitted signing the document entitled “Personal Guarantee” on February 9, 1984 along with his wife, Celeste. The document was introduced into evidence. It provided:
*647 [[Image here]]
*648 Goldstein testified no one from Acme told him he had to pay on his balance before boots would be shipped. He stated he did “heavy advertising” for the Mardi Gras promotion but received no boots from Acme. It was only after he sent the guaranty he was told he had to reduce the prior balance in order to get the boots.
The next promotion he tried was a World Fair promotion. However, Acme did not ship for that promotion either. He admitted Acme may have given Dance Ranch some credit for the money spent in promoting the Mardi Gras promotion.
To his knowledge the personal guaranty did not guarantee anything other than the Mardi Gras shipment of 444 pairs of boots. However, he admitted shipments were made by Acme in November and December of 1984.
In a previous letter dated October 27, 1983 Goldstein wrote to Acme he personally guaranteed a specific shipment of 800 pairs of lizard boots at $106,000.00. However, he testified that in 1984 when he signed the guaranty at issue in this case he did not know the difference between a continuing guaranty and a specific one.
John Theodore Hampel testified he was employed by Acme in 1984 as Director of Credit. At the time of trial he was Vice President of Sales for the “Dingo Division.” He stated that as a result of the Goldsteins’ signing the document he shipped merchandise to Dance Ranch. Hampel stated he made demands on the Goldsteins for the stipulated amount but did not receive payment. He received a letter dated March 5, 1985 revoking the February 9, 1984 document.
The 1985 revocation letter was introduced into evidence. It provided:
*649 [[Image here]]
Hampel testified the personal guaranty was prepared in Acme’s offices. When asked what had prompted the request by Acme for the guaranty he replied, “[t]he combination of the requests for increase of *650 credit lines and special promotions for Dance Ranch.”
He was aware of a January, 1984 meeting between Sydney Goldstein and Acme representatives discussing a Mardi Gras promotion. From Acme documents he was aware the meeting took place with Acme’s employees Leon Fastow and Joe Edmondson.
These two employees made a request to him as Credit Manager to increase the credit line and to have a special promotion.
Hampel stated Acme was willing to agree to both of these requests on the following conditions:
subject to a security interest being obtained in the products specifically relating to the special promotion and subject to the personal guarantee of Mr. and Mrs. Goldstein of the debt.
* * * * * *
there were also conditions upon which certain payments had to be made.
Hampel testified Acme could not get a security interest in the boots since there was a first mortgage on all of the assets.
Acme’s inter-office correspondence was introduced into evidence. That document lists the following entries:
Feb. 24th Ewing, Ted and Jan met. Discussed the bank’s lien on all inventory. Ted said he could understand Mr. Goldstein not wanting a PMSA. Ted said even though risk was great, we could work on Personal Guarantee alone.
Feb. 24th Jan called Mr. Goldstein regarding Ted’s decision to use Personal Guarantee and forget PMSA. Mr. Goldstein agreed to mail Personal Guarantee that afternoon.
Mar. 7th Personal guarantee received.
Mar. 19th John Saia called to check on status of account. A three-way conversation was held between John, Jan, and Ewing. All three agreed account was too past due to release orders. A balance of $19,000.00 was over 60 days.
Hampel stated that despite the above document’s failure to list payment on past due accounts as a prerequisite to the Mardi Gras shipment this was a condition to the shipment. He noted he had “numerous [conversations with Mr. Goldstein and his bookkeeper regarding ongoing efforts to collect past due amounts.”
He explained that the purpose of the personal guaranty was to raise the credit limit from $50,000.00 to $100,000.00.
Inter-office communication also revealed the following entries:
Apr. 5th: Ewing and Jan proposed a pay plan to get account cleared up so Mr. Goldstein could have boots for Worlds Pair promotion. Of the $30,000.00 balance he could pay:
$10,000.00 Immediately
10,000.00 April 30th
Balance May 30th
A $100,000.00 credit limit would be set with $60,000.00 in boots going out as first payment received.
Apr. 17th David Scott says Mr. Goldstein did not like our pay plan. He will counter offer with another plan.
May 2nd: Mr. Goldstein proposed the following pay plan:
$5,000.00 Now
5,000.00 May 30th
10,000.00 June 20th
10,000.00 August 20th
$2,000.00 deducted from balance of account due to $2,000.00 loss of last deal. $40,000.00 new orders to be shipped payable in September, October, and November.
May 3rd: Mr. Glover did not approve Mr. Gold-stein’s proposal.
Hampel stated he did not think the 444 pairs of boots for the Mardi Gras promotion were ever shipped.
In June, 1984 he met with Sydney Gold-stein in Hampel’s office. Goldstein “definitely” indicated he wanted to continue a business relationship with Acme. Gold-stein discussed the personal guaranty with Hampel at that time as follows:
Well, at that time not only was he trying to get special boots for a special promotion, but he was trying to get boots on an ongoing basis on the reluctance on our part to ship him anything and he came in and met with me and with the president of the company, Bob Turren-tine, and reminded us of his personal *651 guarantee and reassured us that he would personally stand behind the debt of Dance Ranch, Incorporated and was appealing for us to make ongoing shipments to him.
Hampel also met with Sydney Goldstein at Goldstein’s office in July, 1984. Gold-stein again referred to his personal guaranty. In October, 1984 Acme shipped substantial amounts of merchandise to Dance Ranch.
Goldstein only revoked the personal guaranty after Acme demanded personal payment by the Goldsteins. Acme relied on the guaranty to send shipments total-ling thousands of dollars. Dance Ranch’s original credit line was $50,000.00. At the time of the Goldstein revocation the balance due was closer to $100,000.00.
Hampel also testified that in April, 1984 there was a discussion at Acme regarding the amount of credit to be extended Dance Ranch. However, the original $50,000.00 credit limit had been increased since Dance Ranch’s balance became in excess of $90,-000.00.
Appellant argues the personal guaranty was subject to a suspensive condition. He contends the suspensive condition was the shipping of boots for the Mardi Gras promotion. He asserts the trial judge was manifestly erroneous for failing to find a suspensive condition which had not materialized.
The trial judge concluded:
The terms of the personal guarantee are clear, unambiguous and the parties are bound by its contents.
We agree. The terms of the guaranty are clear. It provides for revocation as follows:
This instrument shall remain in full force and effect until notice to the contrary in writing is received by ACME BOOT COMPANY, INC. Clarksville, Tennessee, but no termination shall release the parties hereto of any liability on any indebtedness prior to the date of receipt by ACME BOOT COMPANY, INC. of said notice of termination.
The record amply supports the trial judge’s conclusions. Goldstein did not exercise his option to revoke the personal guaranty after Acme failed to ship the boots for the Mardi Gras promotion. Instead he only revoked the guaranty by his letter dated March 5, 1985 after having received shipments of merchandise in October, 1984. Hampel testified that in June 1984 Goldstein wanted to get boots on an ongoing basis and Goldstein was relying on his personal guaranty for the shipments.
Goldstein had the option of revoking the guaranty but chose not to do so until after the October, 1984 shipment. In Commercial Nat. Bank v. Keene, 561 So.2d 813, 815 (La.App. 2nd Cir.1990) the Second Circuit held:
One who signs a contract is presumed to know its contents. Bank of Coushatta v. Patrick [503 So.2d 1061 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (1987).]
In 1983 Goldstein had executed a specific guaranty. The 1984 guaranty at issue is a continuing guaranty. The trial judge evidently concluded Goldstein could have executed a specific guaranty for the Mardi Gras promotion just as he had done in 1983 for the lizard boots. Instead, Goldstein executed a continuing guaranty upon which Acme relied when it shipped boots in October, 1984.
We agree with the trial judge the terms of the guaranty signed by the Gold-steins were clear and unambiguous. The revocation provision was also clear. Accord La. Dept. of Transp. & Dev. v. Nassar, 512 So.2d 1221 (La.App. 5th Cir.1987). The guaranty was a continuing one which had not been revoked prior to the October, 1984 shipment of boots by Acme. The trial judge had ample evidence upon which to base his findings of fact that no suspensive condition existed and that there had been no failure of consideration.
Accordingly, for the reasons stated the judgment in favor of Acme and against the Goldsteins personally is affirmed at appellants’ cost.
AFFIRMED.